## UNITED STATES DISTRICT COURT

### DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America<br><br>v.<br><br>Miguel Ramon Aragon-Roman,<br>a.k.a., "El Chino"; "Miguel Beybi"; and "Miguelon" | CRIMINAL COMPLAINT<br><br>CASE NUMBER:  24-04260 MJ |

I, the undersigned complainant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

On or about the date described in Attachment A in the County of Coconino in the District of Arizona, the defendant committed the crime of Possession or Receipt of Goods Stolen from Interstate Shipment, in violation of Title 18, United States Code (U.S.C.) § 659, offense described as follows:

**See Attachment A, Description of Count**

I further state that I am a Special Agent for Homeland Security Investigations (HSI) and that this complaint is based on the following facts:

**See Attachment B, Statement of Probable Cause, Incorporated by Reference Herein.**

Continued on the attached sheet and made a part hereof:   ☒ Yes    ☐ No

AUTHORIZED BY: Addison Owen and Travis L. Wheeler, AUSAs

Chris Foster, SA for HSI
Name of Complainant

*Chris Foster* 07-18-2024
Signature of Complainant

Sworn to telephonically before me

July 18, 2024                                                              at          Flagstaff, Arizona
Date                                                                                             City and State

HONORABLE CAMILLE D. BIBLES
United States Magistrate Judge
Name & Title of Judicial Officer

**Camille D. Bibles**
Digitally signed by Camille D. Bibles
Date: 2024.07.18 12:18:50 -07'00'
Signature of Judicial Officer

CC:   USM & PTS

## ATTACHMENT A
## DESCRIPTION OF COUNT
## COUNT 1
### Theft from Interstate Shipment

On July 16, 2024, in the District of Arizona, MIGUEL RAMON ARAGON-ROMAN knowingly possessed goods and chattels, to wit: Nike Shoes, of a value in excess of $1000.00, which had been stolen from a BNSF train while moving in interstate commerce from California to Arizona, knowing the said goods and chattels to be stolen.

All in violation of Title 18, United State Code, Section 659.

## ATTACHMENT B

## STATEMENT OF PROBABLE CAUSE

I, Chris Foster, a Special Agent for Homeland Security Investigations (HSI), being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with HSI and have been so employed since December 1997. I have a Bachelor of Science in Criminal Justice from California State University Sacramento. I am a law enforcement officer of the United States, and I am empowered by law to conduct criminal investigations, make arrests, and serve search and arrest warrants.

2. As a Special Agent with HSI, your Affiant investigates criminal violations of United States law, including import and export violations, controlled substances law violations, and money laundering violations. Your Affiant has participated in hundreds of investigations involving stolen vehicle organizations, theft ring investigations, possession, manufacture, distribution, and importation of controlled substances, as well as methods used to finance drug transactions. As an HSI Special Agent, your Affiant has been trained in conducting narcotics and money laundering investigations and received specialized training concerning violations of the Controlled Substances Act contained within Title 21 of the United States Code. I am currently assigned to the HSI Flagstaff Office located in Flagstaff, Arizona, where we investigate transnational criminal organizations to include money laundering and drug trafficking organizations operating throughout the United States.

3. By virtue of my employment as a Special Agent, your Affiant has performed various tasks, which include, but are not limited to:

    a. functioning as a surveillance agent, thus observing and recording movements of persons involved in violations of United States Code as well as violations of Arizona State law;

  b. interviewing witnesses, confidential reliable informants (CIs) and sources of information (SOI) relative to the violations of United States Code as well as violations of Arizona State law;

  c. functioning as a case agent, entailing the supervision of specific investigations involving various crimes throughout the United States; and

  d. conducting complex investigations involving transnational criminal organizations committing various crimes throughout the United States.

4. I have consulted with other experienced investigators concerning the practices of transnational criminal organizations and the best methods of investigating them. In preparing this affidavit, I have conferred with other Special Agents and law enforcement officers. Furthermore, I have personal knowledge of the following facts or have learned them from the individual(s) mentioned herein.

5. Based on the below facts, your Affiant submits there is probable cause that Miguel Ramon ARAGON-ROMAN committed the crime of Possession or Receipt of Goods Stolen from Interstate Shipment, in violation of Title 18, United States Code (U.S.C.) § 659.

## BACKGROUND

6. Over the past fifteen years, several Transnational Criminal Theft Organizations have been burglarizing BNSF Railway and Union Pacific trains throughout the Southwest of the United States to include Arizona. These organizations consist primarily of Mexican citizens from the Mexican State of Sinaloa who operate out of Arizona and California, with extensive connections throughout California, Arizona, and New Mexico. The train burglaries have increased in frequency over the past two years.

7. The suspects usually scout high value containers on the BNSF railway on Eastbound trains that parallel Interstate 40 near Needles, California. Once the organization targets a particular train of interest, they typically find a location for several train burglars to get on the train. Once on the train, the burglars open container doors while the train is moving and target merchandise to steal such as electronics, tools, and footwear. The burglars often target containers with visible high-security locks and use reciprocating saws,

bolt-cutters, or similar tools to defeat the locking mechanisms. Once the burglars target a specific container that has desirable merchandise, the burglars on the train communicate with follow vehicles utilizing cellular devices, and those follow vehicles surveil the train until it stops, or the burglars will cause the train to stop to unload the freight. The suspects often cut the train braking system air hose, which causes the train to go into an emergency stop (commonly referred to as "UDE"), which is a sudden and dramatic application of all the brakes on the train. By cutting an air hose, the burglars can control when and where the train is stopped to unload the cargo they target to burglarize. This act is very dangerous and can cause a train to derail, which could ultimately cause serious injury or death to BNSF employees or citizens. The suspects have also sabotaged the train signal system by cutting the locks off signal boxes and then by cutting the control wires inside. This is also a dangerous act that creates dark areas on the rail network, requiring non-traditional train dispatching functions and extensive repairs. High-value trains travel at speeds up to 70 MPH on multiple tracks in both east and west directions. The train crews and train dispatchers rely on the signals for safe transportation.

8. Once the burglars unload the merchandise from the container that is on the train, the burglars often hide the product in fields or brush adjacent to the BNSF tracks to conceal it until it can be picked up later. The location of the stolen merchandise is then shared by the train burglars with the use of cellular devices to the surveillance crew who are following the train. The organization will then send box trucks to pick up the stolen merchandise if law enforcement is not detected. Often, the box trucks used by the organization were found to have been stolen with their Vehicle Identification Number (VIN) swapped. Once the stolen merchandise has been picked up, it is usually transported to California where it is sold or fenced to wholesale online retailers such as third-party Amazon and eBay resellers.

//

//

## CURRENT INVESTIGATION

9. Miguel Ramon ARAGON-ROMAN is currently operating as a coordinator and distributor for a Transnational Criminal Theft Organization that is operating out of Phoenix, Arizona, and Los Angeles, California. Based on evidence obtained throughout the investigation, it is believed that ARAGON-ROMAN controls burglar crews and those crews have been burglarizing BNSF Eastbound Trains and stealing millions of dollars of merchandise each year while the trains are transiting from California into and through Northern Arizona in the District of Arizona.

10. A cellular phone tracking warrant for a Cellular Telephone in use by ARAGON-ROMAN was sought by the government and approved by the United States District Court in Flagstaff, Arizona, on May 29, 2024, and was still active at the time of his arrest on July 16, 2024.

11. Your Affiant analyzed the tracking details from the Cellular Telephone data gathered during the above dates and learned that the Cellular Telephone in use by ARAGON-ROMAN had been active near BNSF tracks on approximately ten occasions in California and in Arizona during that period. It is believed that ARAGON-ROMAN has no legitimate reason for loitering in and around the BNSF railway in California or Arizona except in furtherance of BNSF train burglary activities.

12. On June 10, 2024, an HSI undercover operator UCO5684 called the cellular phone in the control of ARAGON-ROMAN. Below is a summary of that conversation as translated from Spanish to English by Task Force Officer (TFO) Carlos Leyva:

    a. ARAGON-ROMAN identified himself as "Chino."

    b. UCO5684 told ARAGON-ROMAN he was looking for product (shoes) and ARAGON-ROMAN responded by saying they don't have any product right now.

    c. ARAGON-ROMAN stated the last load of shoes was already sold in Los Angeles.

    d. ARAGON-ROMAN stated that it depends on how much product they have. ARAGON-ROMAN stated they just chased a train near Needles, California and lost a load vehicle.

    e. ARAGON-ROMAN stated they now have to find another vehicle to use so they can continue working.

    f. UCO5684 told ARAGON-ROMAN that he is willing to pay cash for the items.

    g. UCO5684 asked ARAGON-ROMAN what kind of vehicle they are looking for. ARAGON-Roman mentions they are looking for basic vehicles and nothing too flashy because the "Narcs" are after them.

    h. ARAGON-ROMAN stated they usually have shoes, electronics, and tools.

    i. ARAGON-ROMAN stated they sometimes have computers and laptops, and they will sell them for forty or fifty percent off.

    j. ARAGON-ROMAN stated it also depends on the quantity of product, sometimes they get a van full of product and other times they get more than that.

    k. UCO5684 and ARAGON-ROMAN agreed to stay in communication.

13. Review of cellular phone pings for the Cellular Telephone in the possession of ARAGON-ROMAN for July 15, 2024, show that:

    a. At approximately 10:30 p.m., ARAGON-ROMAN departed San Bernardino, California, and traveled Northbound on Interstate 15.

    b. At approximately 11:05 p.m., ARAGON-ROMAN arrived in Phelan, California and remained in this area for approximately 2 hours.

14. Review of cellular phone pings for the Cellular Telephone in the possession of ARAGON-ROMAN for July 16, 2024, show that:

    a. At approximately 01:05 a.m., ARAGON-ROMAN was traveling eastbound on Interstate 40, just east of Barstow, California.

  b. At approximately 3:00 a.m., ARAGON-ROMAN crossed into Arizona while traveling on Interstate 40.

  c. At approximately 6:20 a.m., ARAGON-ROMAN arrived in Flagstaff, Arizona.

  d. At approximately 6:25 a.m., ARAGON-ROMAN arrived at a Walmart located at 2750 South Woodlands Village Boulevard, Flagstaff, Arizona, while driving a white 2003 Chevrolet Express Van G3500, bearing Arizona license plate J3A70W (the "Van"). Once ARAGON-ROMAN arrived at the Walmart, he did not get out of the Van.

  e. At approximately 11:55 a.m., ARAGON-ROMAN departed the Walmart.

15. Since 2019 a confidential reliable informant (CRI) has assisted with HSI and DEA led investigations. Your Affiant knows that during those investigations, the information the CRI has provided has been accurate and truthful. On July 16, 2024, your Affiant directed the CRI to call ARAGON-ROMAN's cellular device and attempt to arrange the purchase of stolen Nike shoes that were taken from a BNSF train. Your Affiant along with other law enforcement officers were present during the meeting. The meeting and all phone calls made to and from the CRI and ARAGON-ROMAN were recorded and are in the custody of HSI. The meeting and all phone calls made to and from the CRI and ARAGON-ROMAN were monitored by TFO Leyva. Below is a summary of those conversations between the CRI and ARAGON-ROMAN that occurred on July 16, 2024:

  a. At approximately 11:57 a.m., the CRI called ARAGON-ROMAN inquiring about the purchase of stolen Nike shoes. During that conversation ARAGON-ROMAN agreed sell the CRI the Nikes, and to meet with the CRI in Flagstaff, Arizona to complete the transaction. The CRI subsequently directed ARAGON-ROMAN to meet the CRI at Home Depot in Flagstaff, Arizona.

b. At approximately 12:07 p.m., the CRI called ARAGON-ROMAN, and during that conversation, ARAGON-ROMAN told the CRI he was driving a white colored van with tubing style equipment on top of the roof.

c. At approximately 12:21 p.m., ARAGON-ROMAN called the CRI, and informed the CRI that ARAGON-ROMAN was at the correct Home Depot. The CRI then directed ARAGON-ROMAN to where he/she was located in the parking lot.

d. Several minutes later, at approximately 12:38 p.m., agents observed ARAGON-ROMAN arrive at the meet-location Home Depot in the Van, approach the location of the CRI, exit the Van, and proceed to meet with the CRI.

e. During that meeting, which was observed by agents and recorded by the CRI, the CRI asked ARAGON-ROMAN if he/she could see the shoes inside the Van, and ARAGON-ROMAN agreed to show the CRI. Agents observed ARAGON-ROMAN and the CRI walk over to the Van and open the door, at which time the CRI observed that the Van was full of Nike brand shoes.

f. The CRI asked ARAGON-ROMAN how many pairs of shoes were in the Van, and ARAGON-ROMAN stated that there were about 50 boxes, which totals approximately 300 pairs of shoes.

g. The CRI and ARAGON-ROMAN then discussed the price for the transaction, ultimately agreeing on $40 dollars per pair of Nike shoes for a total of $12,000.

h. During that same meeting, the CRI also engaged ARAGON-ROMAN in conversation about his business. Specifically, the CRI asked ARAGON-ROMAN if he had Jordan brand shoes. ARAGON-ROMAN stated, "no because people aren't willing to pay for them." ARAGON-ROMAN further stated he usually sells Jordan brand shoes for about 50% off retail price.

      i. ARAGON-ROMAN and the CRI continued talking about clothing items and other items that ARAGON-ROMAN steals to include Rolex watches and Dyson vacuums.

      j. ARAGON-ROMAN stated the Rolex watches are usually worth around $400.00 and they sell them for $150.00 to $200.00. ARAGON-ROMAN stated that he once had over half a million dollars' worth of watches.

      k. ARAGON-ROMAN also stated they have taken Dyson vacuums from the trains, and the vacuums are worth approximately $800.00 each.

      l. ARAGON-ROMAN added that he had previously been involved in an incident near the Winona Exit where they stole Dyson vacuums from the train.

      m. ARAGON-ROMAN also bragged that he has been involved in several other previous train burglaries, including some near Fresno, California.

      n. When the CRI asked about other product ARAGON-ROMAN had available, ARAGON-ROMAN stated he only had shoes right now.

16. Once the CRI and ARAGON-ROMAN ended their conversation, the CRI departed the area.

17. Several minutes after the departure of the CRI, agents observed ARAGON-ROMAN standing outside of the Van he arrived in, talking on the phone. At that point, agents moved in to arrest ARAGON-ROMAN, who was apprehended without incident.

18. Incident to ARAGON-ROMAN's arrest, agents conducted a safety check of the Van. Once the doors of the Van were opened, agents learned there were no other people in the Van. When the cargo area of the Van was opened during the safety check, agents observed approximately 50 master cases of Nike shoes with style number FJ4195-300.

      a. Your Affiant later learned that FJ4195-300 has a retail value of $80 per pair.

      b. Your Affiant knows there are six pairs of Nike shoes in each master case, establishing an estimated resale value of $24,000 for the shoes found in ARAGON-ROMAN's vehicle.

    c. Agents transported the Van to the Flagstaff Police Department located at 911 East Sawmill, Flagstaff, Arizona, for safe keeping.

19. On July 16, 2024, BNSF Special Agent Derrick Porter told your Affiant the following information:

    a. Nike Shoe style number FJ4195-300 was determined to have been burglarized sometime between July 10, 2024, and July 11, 2024, in either California or Arizona, during several long-term BNSF train stoppages.

    b. FJ4195-300 was inside container TCKU4641317 that was being transported on BNSF train ZLACALT510A.

20. Your Affiant conducted Department of Homeland Security import research related to container TCKU4641317 and learned the following:

    a. On May 26, 2024, container TCKU4641317 was shipped on the Motor Vessel YM WISH 42E from Singapore, and arrived at the Long Beach, California, Seaport on June 25, 2024.

    b. After its arrival, container TCKU4641317 was transferred to BNSF for transportation along the Transcon to Atlanta, Georgia.

*Miguel Roman ARAGON-ROMAN*

21. Your Affiant conducted law enforcement checks and learned ARAGON-ROMAN is a Mexican citizen from Sonora, Mexico, and is present in the United States illegally.

22. On July 16, 2024, at approximately 2:18 p.m., Special Agent Tazten Starnes and TFO Leyva interviewed ARAGON-Roman at the Flagstaff Police Department. After being read his *Miranda* rights in Spanish, ARAGON-ROMAN agreed to speak with law enforcement without an attorney present. The interview was video recorded. Below is a summary of the interview:

    a. ARAGON-ROMAN stated that his full name is Miguel Ramon ARAGON-ROMAN and provided his date of birth.

b. ARAGON-ROMAN stated that he lives in Phoenix, Arizona, but was born in Obregon, Sonora, Mexico. ARAGON-ROMAN said that he walked across the border (illegally) near Sonoyta, Sonora, Mexico approximately two years ago. ARAGON-ROMAN remembered that he turned 20 years old while crossing.

c. ARAGON-ROMAN said that he could not remember his address in Phoenix but said it was near 15th Avenue.

d. ARAGON-ROMAN stated that he works in construction, does drywall and used to do concrete work and other side jobs.

e. TFO Leyva asked ARAGON-ROMAN why he was here today and ARAGON-ROMAN responded for "being a fucking idiot."

f. ARAGON-ROMAN stated he was asked by a friend to transport the van, and that he would be compensated $1,000 USD.

g. When asked about what was in the van, ARAGON-ROMAN stated that he did not know what was in the van.

h. TFO Leyva showed ARAGON-ROMAN the cellphone that was found on his person when he was arrested. ARAGON-ROMAN stated that the cellphone was his phone and indicated that it was an iPhone 14 with a clear case. ARAGON-ROMAN stated that his phone number was 480-388-4544.

i. ARAGON-ROMAN stated that he does not have any other phones.

j. ARAGON-ROMAN did not give consent to search his phone.

k. At approximately 3:20 p.m., agents concluded the interview.

## CONCLUSION

23. For these reasons, your Affiant submits that there is probable cause to believe Miguel Ramon ARAGON-ROMAN committed the crime of Possession or Receipt of Goods Stolen from Interstate Shipment, in violation of Title 18, United States Code (U.S.C.) § 659.

24. I declare under penalty of perjury under the laws of the Unites States of America that the forgoing is true and correct.

*Chris Foster*   07-18-2024
_____
CHRIS FOSTER
Special Agent
Homeland Security Investigations


Sworn to and subscribed telephonically this ____18____ day of July, 2024.

**Camille D. Bibles**
Digitally signed by Camille D. Bibles
Date: 2024.07.18 12:18:11 -07'00'
_____
HONORABLE CAMILLE D. BIBLES
United States Magistrate Judge